case number 22-1400. Ms. Stengel? You may proceed. May it please the court, my friend from the United States, I am Jessica Stengel representing Mr. David Vargas. You see something. It looks like a duck. It walks like a duck. It sounds like a duck. You're unlikely to look at that thing in point and say goose. Yet that's exactly what happened in the case below. The district court saw Mr. Vargas brandish a gun. The district court saw Mr. Vargas otherwise use the gun. And then the district court pointed and said, that's physical restraint. Let's imply the enhancement. In a more formal way of saying it, as a matter of law, the district court's factual findings are insufficient to support application of the physical restraint enhancement for both robberies. Why is that so, particularly as to the DSW robbery? So I think there are two answers, and I'm going to go with the easy one first. There was no specific targeting with the gun where Mr. Vargas specifically prevented any victim from moving. And I think that's an easy answer to come to by first looking at what this court has said, starting in Fisher and consistently through Miera, that first of all, the physical restraint enhancement is something more than brandishing and something more than simply otherwise using a gun. And in the very narrow context, physical restraint occurs when a defendant specifically points a gun at a victim and prevents him from moving. So I guess where I'm stuck is how that's not the facts, specifically as to the DSW robbery. Should we not construe the slamming of the gun down on the counter as pointing? Do we have to conclude that the district court did not clearly err in finding the gun was pointed? I think for purposes of this argument, we look at what the victim testified to, and the victim testified that the gun was pointed at her. Would you pull a microphone? I apologize, Your Honor. So the victim during trial said, Mr. Vargas pointed the gun at her. I don't think there's a basis to argue against that. What Mr. Vargas did not do when he pointed the gun at her, he did not say freeze. He did not say don't move. What he said was pick up the shoes. And this is precisely the case. This replicates what happened in United States versus Ortiz, where the court was dealing with the otherwise use enhancement. And there the court said, okay, let's distinguish between otherwise use and brandishing. And brandishing is a general threat. I think Mr. Vargas absolutely brandished the gun in the footlocker incident. He made it known it was a general threat. He didn't point it at anyone. He didn't say don't move. He didn't even say this is a robbery. In the DSW robbery, he brandished the gun, and I think slamming the gun on the counter is unequivocally brandishing. And I think the jury agreed. They convicted him of the 924C count. Then he went one step further. There's something more to get into the otherwise use of the gun, which is he brandished the gun, pointed the gun at the clerk, and said do something. I'm ordering you to comply. And that's exactly what happened in Ortiz, where in the course of a carjacking, albeit with a BB gun and not a quote-unquote real gun, there Mr. Ortiz carjacked someone, first pointed his BB gun at the passenger and said give me the car keys. Passenger's not going to have the car keys. Mr. Ortiz, getting frustrated, said great, I'm going to point my gun now at the driver. Give me the car keys. And there the court found that specifically targeting an individual with a gun and ordering compliance, ordering affirmative movement to do something, was otherwise use. It was not physical restraint. So are you saying that in order to apply the enhancement in the DSW context specifically, there needed to have been some additional language from Mr. Vargas? Absolutely, Your Honor. And is that what our cases say? That you actually have to, we can't just look at the facts we have here, that what's missing is that a command of some sort that satisfies physical restraint? Yes, Your Honor. It really does seem to come down to magic words. This court's jurisprudence interpreting the physical restraint enhancement has been overly expansive. And I think the court today, excuse me, the panel today, has the opportunity to take one of two roads. The first road is the easy road and say, look, this matter, we're not breaking new ground. There's nothing new. He otherwise used the gun. He did not physically restrain anyone. Look at Ortiz. Look at what we've said in Miera and Fisher and Pearson. We're done. The other option the court has to say, this is a great opportunity to refine and clarify what is pretty much right now a boundless interpretation of the physical restraint enhancement. I think the government... In what way is it boundless? I mean, our case law suggests that we look beyond the examples and the guidelines. We have a broad interpretation, but there certainly is a limiting principle in our law, is there not? I think that the court in Jove suggested that there is no limiting principle at present. And I think the government's brief absolutely takes advantage of that. And you can see it in two obvious points. The first is when the government offers it the guideline definition of what it means to be physically restrained. They notably admit the list of illustrative examples. So they want it to be this broad idea where in any time you're fearful, in any time using their language, there's a denial of the freedom of movement. Do we have physical restraint? Quite frankly, that seems a far-fetched proposition given that every robbery involves fear and every robbery will involve some type of restriction of movement. And the guidelines are intended to punish as... Excuse me. The guidelines increase punishment as culpability increases. So we start with an already high base offense level because every robbery will involve fear and some type of restriction of movement. So this is a robbery, but go about your business. Please conduct business as you see fit. So if you were asking this court in this case to refine, as you say, what would be the most precise articulation of the limiting principle you would have us write? I think at a minimum, Your Honors, it would be to return to the physicality that the guidelines offer as examples in terms of being bound up, in terms of being tied, in terms of being physically restrained. I think this court in Shakura got it absolutely right where first the victim, excuse me again, the victim was tackled. And then when that was... So we have a physical force being acted upon the victim to prevent his movement. When then, in that case, the defendants made extra sure that the victim could not move, they physically restrained him by putting a stove on top of him. I think the word physical has to have meaning. I think we can see that from both this court's case law and from the list of examples in the guidelines. So are you suggesting that the defendant is the one that has to do something physical? I mean, it seems like our case law has said, and I don't see it as inconsistent with the guidelines, that we look to whether the defendant's conduct kept someone from doing something. Agreed, Your Honor. So again, it goes back to the guidelines, which are intended to punish the defendant's conduct. What the guidelines did not say, and what an overly expansive interpretation of the enhancement would do, the guidelines did not say, if a reasonable person would feel restrained, then apply the physical restraint enhancement. The guidelines say, if the defendant forcibly restrained, so acted upon, the defendant has to do something. And again, based on this court's case law, it has to be something more than brandish or otherwise use the gun. Is blocking an exit while holding a gun sufficient for the enhancement? It is necessary, absolutely, and that's the specifics of MIERA. And I think MIERA is simply an example of, these facts are enough, but it won't be required in every case. What happened in Ortiz after the gun was pointed, first at one victim, then the other? What happened then? Well, eventually the defendant was caught. I think he was able to... I don't know what happened. Was there any further threat? I mean, did he then just set the BB gun down, or what? The case does not tell me what happened following that. Well, OK. So in this case, since we don't know what happened to Ortiz, I'm not sure how helpful it is then. Because in this case, you say the brandishing happens when he slams it down. OK. Is it just supplemental brandishing when he keeps his hand on the gun and then moves it as the cashier is moving and picking up the boxes, making sure that she is further restrained? Why is that the wrong way to look at this? Your Honor, I respectfully disagree with how you characterize what happened, because that is not what happened. The testimony is clear that he slammed the gun on the counter. Absolutely. He moved the gun. Boxes fell. Then he picked up the gun. The cashier testified that he pointed it at her. And he said, do something. Actively do something. And that is consistent with this court's jurisprudence in terms of otherwise use of the gun. He did not say to the cashier, pick them up and don't move. He did not say freeze. I'm talking about what he physically did with the gun. Didn't he, after that, continue to move the gun? No, Your Honor. What he did is he picked up the gun. He told the cashier to pick up the boxes. She picked up the boxes. He walked away. He and his accomplice walked away. And he apologized as leaving the store. All right. Let me ask you about Chikora. You say that's a helpful case for you. In Chikora, it says, restraint to mean the defendant's conduct must hold the victim back from some action. Maybe it didn't happen here. Procedure or course. Prevent the victim from doing something, comma, or otherwise keep the victim within bounds or under control. Are you telling me that there is no way to construe these facts in a way that he was otherwise keeping the victim within bounds or under control? Correct, Your Honor. Based on this court's case law, controlling case law, the court is bound to follow precedent both in terms of the narrow legal holding and the principles underneath it, as you wisely said in Wells. That is precisely what this court has said is otherwise using the gun. And it's obvious in Ortiz, but it's also obvious if you take Chikora and you couple that with what the court said in Romero's Hernandez. Romero's Hernandez notes that the guidelines knows how to use physical as a limiting principle. And there they said, without physical to modify the use of force, it absolutely gets at the disparity of influence, which this court take a step to the side to adjacent to the forcible sex offense, this court has routinely and consistently held that that is the otherwise use of a gun. And if there are no further questions, I have one more question. I do. I do. I'm not finished. You can go first. I understood the facts in this case a little differently than you do, or at least evidence that the judge could rely upon. My understanding that he ordered the manager to pick up the boxes, and he more in the sense of directions, telling her, moving the gun to get the boxes. And then the manager went to pick up the boxes, and he moved the gun across the counter so that as she moved, the gun remained pointed at her. Now, that's my understanding of the facts. It seems different than what you said the facts were. I think we disagree about what he did with the gun, but giving your Honor version of what happened, Creedence, great. He did not physically restrain her. Under this court's case law, he otherwise used the gun, and he's being punished for that. Well, he made sure that she was doing exactly what he told her to as he moved the gun as she moved. And this court said— And that seems to fit the language that I was quoting from Cicora. What this court said in Rucker in 1999, and the cite for this is going to be 178 F. 3rd, 1371, that otherwise using a gun is when a defendant points a gun, specifically points a gun at a victim, and orders compliance with demands. That is precisely what Mr. Vargas did in this case, and he did not do the something more that this court requires. Judge Murphy? I have one question for you. You talk about Taylor, the Second Circuit decision, and Taylor in your brief. What are we supposed to do with that? It's not consistent with our case law, you would agree? It is a more refined approach to the physical restraint enhancement. It specifically distinguishes us. Right. Our case law is different. I'm about to go over. Can I answer the question? Yes, you may. I would say that MIERA is not breaking any new ground, Your Honors. So we can sort of put Taylor's treatment of MIERA to the side and say we have Fisher and Cicora and Pearson, and those are very broadly construed. And while the Second Circuit thinks MIERA is a step too far, that is a very fact-specific use of the case law. And really, Taylor could be used as a guidepost for this Court on how to refine and clarify a pretty much boundless reading of the physical restraint enhancement as it stands. Thank you, Your Honors. Thank you. Mr. Moham? Good morning, Your Honors, and may it please the Court. Rajiv Mohan for the United States. It sounds like we all agree that the enhancement requires forcible restraint. And it sounds like the dispute is more about the restraint side of things, whether there was something more to show that the victims were restrained as a result of Mr. Vargas' conduct. And I'd first like to provide just a little bit of legal context to that before I cite the specific facts in each robbery which we believe constitute to something more. And you heard a lot about the relationship between physical restraint and otherwise used. And this Court squarely addressed that issue in Rucker, holding that there was no impermissible double counting in applying both enhancements. And I think the important point from that opinion is that the Court recognized, and this is at page 1371 of the opinion, that the multiple enhancement of a sentence for a single type of conduct does not, without more, amount to double counting. So the implication that if the conduct here qualifies for the brandishing enhancement or the otherwise used enhancement, it cannot also qualify for the physical restraint enhancement is, I think, wrong. The test for double counting is whether the provisions necessarily overlap or indistinct and serve identical purposes. So I think the conduct can satisfy both enhancements and still count as physical restraint. And addressing the something more in each robbery, let me start with the DSW robbery. Because there, as the Court has recognized, Mr. Vargas first pointed the revolver at the victim when he slammed it on the counter, and he then forced her to pick up the boxes and kept the gun pointed at her while she did so. And what I think is important about the second aspect of that is that when she went to pick up the boxes, she was moving in the direction of the only way out of the register. And there's really no reason for Mr. Vargas to keep the gun pointed at her, except to ensure that she did not try and make a break for it or otherwise interfere with the commission of the offense, and that she did nothing more than pick up the boxes. Why isn't his conduct at most intimidation in that setting? Your Honor, I think it is the forcible denial of the freedom of movement. So she was, it was not just sort of, you know, I think it would be only intimidation if Mr. Vargas, say, walked into the store, brandished the gun, and started taking shoes, shoe boxes off the racks. I think he did more to ensure that the victim was under control so that he could get the shoe boxes that fell off on the ground and get away with them. I think that is illustrated by the initial pointing, which hemmed her in the space of the register, and the subsequent command to pick up the boxes, which further ensured that she stayed there and did his bidding. Is it the government's position, or I guess a better way to ask this question might be, is it your understanding of the appellant's argument that there is not a challenge to, a factual challenge to the pointing? That the appellant is not suggesting that there is clear error in finding that there was pointing in the DSW robbery? That is my understanding. The district court made that finding. It also adopted the finding in the pre-sentence report to that effect. And there was also no objection to that finding below. So I think there has not been... So is it the government's position that that is undisputed for purposes of our review of the application of the enhancement? It is. And turning to the footlocker robbery, I was... Wait a minute before you leave. Sure. What is the evidentiary basis for your outline for us, the layout of the counter and everything at DSW? Because I have to take out of my mind, I've stood in that line there, and a lot of stories are laid out the same. What is there in the evidence in this case that shows that her only way out was that back door? So that would be Government Exhibit 4C, which we conventionally submitted. It is a video of the robbery sort of from behind the register, and you can basically see everything there. You can see the layout of the register. You can see the revolver on the counter, Mr. Vargas waving it, and all of that. Your viewing of that video, does it suggest, as you have suggested, that as the cashier is moving to pick up boxes, she's moving in the direction of the door, at least horizontally along that counter. And the gun on the counter is following her as she moves in that direction. Yes, and it's not so much a door as just there are three sides of the register, and the fourth side is open, so that is the only way out. And my recollection of the video is that Mr. Vargas picks the gun up off the counter, sort of waves her in the direction of picking up the boxes, and sort of slides it across the counter so that it stays pointed at her as she moves to the side.  Yes, he does take his hand off briefly before all of that, but I think apart from that, his hand is on the gun at all times. But then he returns his hand to the gun and moves it. Correct. Turning to the footlocker robbery, I would cite four circumstances that show that the victims thereto were restrained. First, Mr. Vargas approached the victims and brandished the firearm in close proximity to them. Second, he made the revolver click, which emphasized to the victims both that the firearm was present and that it was real. Third, he issued verbal commands which conveyed a message not to interfere. First, he said, you're going to have to let us take everything. And he later said, go stand back there with your hands up. And that is at page 798 of Volume 2 of the Supplemental Record on Appeal. And fourth, he forced the victims to drop what was in their hands, which was a further exercise of his control over their freedom of movement. Did he ever point the gun at any victim? Not in the footlocker robbery. But I think Mira makes clear that while individual targeting with a gun is sufficient in most cases, I think it specifically explains that it is not necessary. And I would submit that Mr. Vargas brandishing the firearm, even if it was not pointed at the victims, just feet away from them, was in fact more targeted than the sort of aimless waving that was at issue in Mira. That's a very fine line for us to draw, though. Sorry. Okay, he didn't point the gun. What precisely did he say? So he initially said, you're going to have to let us take everything. He didn't yell out freeze or anything. He did not, but he did later say in the course of the back and forth, go stand back there with your hands up. And I think the message of those words was, don't make a move to interfere. And I think the victims got that. Do we have audio on the video? You do not have audio on the video. You have the testimony from one of the employees who testified to the conversation. And the testimony of the witness. I know this is not outcome determinative necessarily, but was not particularly concerned about their own life. Correct? I would disagree with that. I think the victim testified that Mr. Vargas was somewhat apologetic. I think it's fair to say he was not as menacing as other robbers, but I think there was still testimony from the victim that he was afraid, and he stood back and did not interfere because Mr. Vargas had the gun. And I think that qualifies as restraint under this court. Is this the first case you've ever had where the robber apologized? I think so. But, you know, as I think the victim in the DSW robbery emphasized, it's not really an apology when a large silver revolver is pointed at you. And so I don't think his apology takes away from the restraining effect of his conduct. But there was no large silver revolver pointed at him in the footlocker. Well, there was a large silver revolver pointed. Well, it was, okay, in the footlocker. Well, wait a minute. It was not pointed at him. Correct. In the footlocker robbery, it was not pointed. It was never revealed. It was. He was holding it out in front, so it was visible to the victim. And we have a video of this, too. Yes, and this is government exhibit. Can we see a shiny silver thing that he's holding down? Yes. Okay. I wanted to ask you a question about sort of the government's understanding of how we're supposed to be thinking about victim conduct and applying this enhancement. So, you know, typically enhancements are intended to enhance the defendant's sentence because of their conduct. So a lot of your arguments, at least in the briefing, particularly about the footlocker robbery, turn on what the victims did. So could you speak to that, to what extent we're supposed to look at victim conduct in applying the enhancement? Sure. And I think that it is true that it is the defendant's conduct that must restrain. But I think the text of the enhancement in asking whether a person was physically restrained necessarily requires consideration of that person's position and whether they were in a position where their freedom of movement was compromised. And I think that's why this court in Murrah considered whether a reasonable person would have felt restrained under the circumstances. So I think the victim's responses are certainly indicative of whether a restraint was imposed. And, you know, a couple of points I would highlight from the footlocker robbery is that, you know, the testimony was that the female victim was on her way back to the stockroom to pick up some shoes in another size when Mr. Vargas approached and pulled out the revolver. She obviously did not make it back to the stockroom. And I think that is an illustration of how her movement was interfered with. She was prevented from going where she was otherwise going as a result of Mr. Vargas's conduct. I'd like to briefly address these questions about the breadth of our interpretation  I think what you heard Mr. Vargas urge this panel to do is really walk away and conflict with prior precedent in this circuit. I think the dividing line between this circuit and say the second circuit is that in the second circuit, restraint by means of a firearm is insufficient because in that court's view, any restraint is the product of the victim's sort of psychological response. Whereas this court has rejected that. And I think it is clear from Fisher and cases after that restraint by means of a firearm is sufficient. So I think that all of Mr. Vargas's arguments directed to the form of restraint are really beside the point here. And the question is whether there was something more to show that the victims were restrained. And we believe that was the case. And if there are no further questions. One more. Yes. Would you agree that the factual basis for the DSW robbery and the Foot Locker robbery are different? The factual basis to support the enhancement that the facts are different in those two robberies. Would you agree? Yes. OK. And would you also agree that the DSW robbery might present a stronger case for the government? I think that's a fair characterization. And if that is true, why? Why is that so? What is missing in the Foot Locker robbery that you think makes the DSW robbery a stronger predicate for the application of the enhancement? I think the pointing is a significant thing. I think this court in Murrah recognized that even aimless waving would in all likelihood restrain everyone present. And in footnote four, the court observed that insofar as the gun was pointed at anyone, those persons would have felt particularly physically restrained. So I think it's fair to say that the victim in the DSW robbery was particularly physically restrained. And the victims in the Foot Locker robbery were also physically restrained. Thank you. Thank you, counsel. Is there any time left? Thank you for your helpful arguments. The case will be submitted.